# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                 No. CR 15-1028 JB

ORLANDO JAY JOHNSON

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the United States' Sentencing Memorandum and Motion for Upward Departure Pursuant to U.S.S.G. § 5K2.0, filed June 4, 2015 (Doc. 21)("Motion"). The Court held a sentencing hearing on June 26, 2015. The primary issues are: (i) whether upward departure is permitted under U.S.S.G. § 5K2.1 or U.S.S.G. § 5K2.21; (ii) whether an upward departure is appropriate where Defendant Orlando Jay Johnson stole J. Descheenie's[1] wallet, Descheenie pursued Johnson in his vehicle and recovered his wallet, and then Descheenie experienced heart trouble, and died the following day; and (iii) whether a variance from the guidelines range is warranted pursuant to the factors 18 U.S.C. §3553(a) sets forth. For the reasons given on the record at the sentencing hearing, and for the reasons stated herein, the Court concludes that an upward departure is not legally permissible under either U.S.S.G. § 5K2.1 or U.S.S.G. § 5K2.21. Even if the Court were authorized to upwardly depart under § 5K2.1 or § 5K2.21 it would exercise its discretion to not depart. The Court concludes,

---

[1]The Court has searched the record and is unable to locate the victim's first name. The Defendant's Response to Government's Motion for Upward Departure and Variance and Defendant's Objection to Presentence Report, filed June 17, 2015 (Doc. 22), however, states that the victim's last name was Descheenie. The Court therefore will refer to the victim throughout this Memorandum Opinion and Order ("MOO") as J. Descheenie.

however, that Johnson should be sentenced at the high end of the guidelines range pursuant to the factors set forth in 18 U.S.C. §3553(a).  The Court therefore sentences Johnson to a term of imprisonment of twelve (12) months.

## FACTUAL BACKGROUND

Johnson was born in Cortez, New Mexico, and has spent nearly his entire life in New Mexico.  According to the Presentence Investigation Report (disclosed May 21, 2015)("PSR"), which the Court adopted as its factual findings,[2] Johnson attended Foothill High School in Albuquerque until his junior year, at which point he entered the Youth Diagnostic and Development Center ("YDDC")[3].  PSR ¶ 54, at 12.  "He did not complete high school and

---

[2]The parties do no object to the PSR, except that Johnson objects to the statement in paragraph 8 of the PSR that "he targeted the victim because he appeared to be an easy target." Defendant's Response to Government's Motion for Upward Departure and Variance and Defendant's Objection to Presentence Report at 1, filed June 17, 2015 (Doc. 22)("Response"). At the sentencing hearing, however, the parties agreed that this sentence could be removed and replaced with alternative language:

> THE COURT: Well, let me ask -- let me ask the government.  What if we took out the sentence that's there and we said he agreed that -- that -- he agreed that the fact that he was an older guy and was less likely to fight with him and chase him played into he -- he agreed that that played into his decision and take out the port -- that part that he targeted the victim because he appeared to be an easy target? Could the government live with that?
>
> MS. RUIZ-VELEZ: Yes, Your Honor.
>
> THE COURT: All right.  Could you live with that, Ms. Katze?
>
> MS. KATZE: Yeah, I guess so.

Transcript of Sentencing Hearing at 4:5-17 (taken June 26, 2015)(Court, Ruiz-Velez, Katze)("Tr.").  The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

[3]The YDDC is a juvenile center in New Mexico that houses most violent youth incarcerated in the New Mexico Corrections Department.

enrolled at Dine College in August 2014 to earn his GED."  PSR ¶ 54, at 12.  Johnson was scheduled to take his final test to earn his GED, but he failed to show up.  See PSR ¶ 54, at 12.

The criminal activity for which Johnson was indicted took place on October 23, 2014. See PSR ¶ 8, at 3.  Johnson went into a fast food restaurant in Shiprock, New Mexico, and waited inside.  See PSR ¶ 8, at 3.  "Johnson told investigators that he had not eaten for days prior to his arrest in the instant offense."  PSR ¶ 8, at 3.  While waiting inside, Johnson saw Descheenie, an elderly man, seventy-seven years old, enter the restaurant and pay for an item with cash.  See PSR ¶ 8, at 3.  Johnson followed Descheenie outside and approached him as he entered his truck.  See PSR ¶ 8, at 3.  Johnson took Descheenie's wallet from his back pocket. See PSR ¶ 8, at 4.   Descheenie yelled at Johnson as he ran away with the wallet and began to follow Johnson in his truck.  See PSR ¶ 9, at 4.  He caught up with Johnson after about a half-mile, at which point Johnson returned the wallet to Descheenie but kept $16.00 that was inside the wallet.  See PSR ¶ 9, at 4.

Officers with the Navajo Police Department were dispatched to the scene.  See PSR ¶ 10, at 4.  They spoke with both Descheenie and Johnson, who told them he was sorry and did not mean to take the money.  See PSR ¶ 10, at 4.  "Officers searched Johnson and recovered the $16.00, at which point he was arrested."  PSR ¶ 10, at 4.

> The victim told officers after he purchased coffee at the fast food restaurant and was heading back towards his truck, he felt his wallet being pulled from his pocket.  He said he yelled at Johnson and began following him in his truck.  When the victim did catch up with Johnson, he yelled again and Johnson approached the victim's truck and gave back the wallet and money while apologizing.  The victim noticed he was still missing money, which is when the officers arrived.

PSR ¶ 11, at 4.  While officers were speaking with Descheenie, who was sitting in his truck, they noticed he was sweating and shaking.  See PSR ¶ 12, at 4.  Descheenie said he was fine, but then started coughing and taking deep breaths.  See PSR ¶ 12, at 4.  The officers asked Descheenie if

- 3 -

he had ran after Johnson, at which point the Descheenie did not answer and continued to cough and breathe deeply.  See PSR ¶ 12, at 4.  Officers asked Descheenie if he wanted an ambulance, and Descheenie responded that he was fine and would be heading home.  See PSR ¶ 12, at 4.  As the officers were leaving the scene, however, Descheenie waved them back and requested they call for an ambulance.  See PSR ¶ 12, at 4.

Descheenie was subsequently taken to the Northern Navajo Medical Center in severe respiratory distress.  See PSR ¶ 13, at 4.  "He was wheezing and unable to speak more than a few words upon arrival at the hospital and was very agitated."  PSR ¶ 13, at 4.  Descheenie was placed on a gurney, but kept trying to stand up and remove his oxygen mask.  See PSR ¶ 13, at 4.

> The victim was transferred to the San Juan Regional Medical Center by San Juan Regional AirCare as there was not an Intensive Care Unit (ICU) bed available at the Northern Navajo Medical Center and he had a life threatening cardiac condition, among other ground transportation issues.  There were multiple attempts to intubate the victim who was made stable and transferred to ICU due to his prior cardiac history.  He underwent an emergency bronchoscopy to help clear foreign bodies from his airways but he remained hypoxic and hypotensive.  The victim also underwent an esophagogastroduodenoscopy (EGD) which showed some bleeding.  Due to a concern for coronary artery disease, doctors intended to place the victim on a heparin drip, but the bleeding in his upper gastrointestinal prohibited it.  The victim was hypoxic ventilator dependent, which was determined to be secondary to his cardiac issues and his aspiration.  The victim continued to decline despite efforts and medication and it was determined he needed a ventricular assist device (heart pump).  Doctors consulted with the victim's family regarding the risks and benefits of the device as well as alternative treatments for the victim.  The family opted to transfer the victim to comfort care only.  The victim became uncomfortable and began pulling at his support tube, which was removed and he died shortly afterwards.

PSR ¶ 14, at 4-5.

## PROCEDURAL HISTORY

On October 29, 2014, Johnson was charged in a criminal complaint with robbery in Indian country in violation of 18 U.S.C. §§ 2111 and 1153.  See Criminal Complaint, filed October 29, 2014 (Doc. 1)("Criminal Complaint").  After two grand jury continuances, on March

26, 2015, Johnson entered into a plea agreement with the United States in which he pleaded guilty to information charging him with theft in Indian country in violation of 18 U.S.C. §§ 661 and 1153. See Plea Agreement, filed March 26, 2015 (Doc. 18)("Plea Agreement"). The United States Probation Office ("USPO") subsequently disclosed the PSR on May 21, 2015. The PSR indicates an upward departure may be warranted under U.S.S.G. § 5K2.21 for dismissed and uncharged conduct, but that a variance would not be appropriate. See PSR ¶ 78, at 15. Regarding U.S.S.G. § 5K2.21, the PSR does mention that Johnson was originally charged with robbery, but rather contends: "The circumstances of the instant offense are not considered in regards to the applicable guidelines section, which does not provide guidance in the event of a death in the manner it occurred in connection to the theft." PSR ¶ 78, at 15. The PSR, however, does not discuss the possibility of an upward departure under U.S.S.G. § 5K2.1.

In its Motion, the United States argues that an upward departure is warranted under U.S.S.G. § 5K2.1 and § 5K2.21, and that an upward variance is warranted under 18 U.S.C. § 3553(a) because the theft resulted in Descheenie's death. Regarding U.S.S.G. § 5K2.21, the United States contends that the Court should upwardly depart under the guidelines, because Johnson was originally charged with robbery in Indian country in violation of 18 U.S.C. §§ 2111 and 1153, citing U.S.S.G. § 5K2.21. See Motion at 6-7. According to the United States, "after two grand jury continuances, the United States and the Defendant reached a plea agreement to which the Defendant pleaded guilty to an information charging him with theft in Indian country in violation of 18 U.S.C. §§ 661 and 1153." Motion at 7. Based on this information, the United States concludes in its Motion: "Neither the robbery nor the theft contemplates the death of a person as part of the elements for each offense. Nevertheless, the Defendant's conduct led to the death of J.D., which is a relevant fact that warrants an upward departure in the Defendant's

sentence." Motion at 7. In his Response, Johnson maintains that an upward departure under U.S.S.G. § 5K2.1 and 5K2.21, and a variance under 18 U.S.C. § 3553, is either not permitted or is not warranted because Descheenie's death in this case was not reasonably foreseeable.

The Court held a sentencing hearing on June 26, 2015, during which the parties reiterated the arguments set forth in the briefing, particularly regarding foreseeability. The United States conceded that "the main factor that the Court [should] take into consideration for an upward departure is the death of the victim and not whether the defendant was charged or not charged with robbery." Transcript of Sentencing Hearing at 12:17-13:6 (taken June 26, 2015)(Ruiz-Velez)("Tr.").[4] Further, the United States agreed at the hearing that, while an upward departure is warranted in this case, it is not certain that the best place to rest it is on § 5K2.21. See Tr. at 13:7-12 (Court, Ruiz-Velez).

## ANALYSIS

The PSR indicates that an upward departure may be warranted under U.S.S.G. § 5K2.21 for dismissed and uncharged conduct, but that a variance is not appropriate given the circumstances of the case. See PSR ¶ 78, at 15. The PSR, however, does not discuss the possibility of an upward departure under U.S.S.G. § 5K2.1. The United States asserts that an upward departure is warranted under U.S.S.G. § 5K2.1 and § 5K2.21, and that an upward variance is warranted under 18 U.S.C. § 3553(a).[5] Johnson maintains that an upward departure

---

[4]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions. Any final versions may contain slightly different page and/or line numbers.

[5]The United States asks the Court to impose an upward departure either under § 5K2.1 or under § 5K2.21 to account for the fact that the theft resulted in a death. Additionally, the United States asks the Court to consider Descheenie's death as grounds for an upward departure pursuant to the broader provision, U.S.S.G. § 1B1.4. Section 1B1.4 states: "In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is

under U.S.S.G. § 5K2.1 and 5K2.21, and a variance under 18 U.S.C. § 3553, is either not permitted or is not warranted.

## I.     THE COURT WILL NOT GRANT AN UPWARD DEPARTURE UNDER U.S.S.G. § 5K2.1.

The United States contends that an upward departure is appropriate pursuant to U.S.S.G. § 5K2.1 because the Guidelines do not account for the fact that the theft resulted in a death, and that Johnson was originally charged with robbery in Indian country in violation of 18 U.S.C. §§ 2111 and 1153.  The Court concludes that, under binding precedent in the United States Court of Appeals for the Tenth Circuit, it cannot impose an upward departure under U.S.S.G. § 5K2.1, because Descheenie's death in this case was not reasonably foreseeable.  Even if the Court were authorized to impose an upward departure under § 5K2.1, however, it would exercise its discretion to not impose such a departure.

### A.     THE COURT IS NOT AUTHORIZED TO IMPOSE AN UPWARD DEPARTURE UNDER U.S.S.G. § 5K2.1, BECAUSE DESCHEENIE'S DEATH WAS NOT REASONABLY FORESEEABLE.

Johnson asserts that an upward departure under § 5K2.1 is improper, because Descheenie's death was not reasonably foreseeable.  <u>See</u> Defendant's Response to Government's Motion for Upward Departure and Variance and Defendant's Objection to Presentence Report, filed June 17, 2015 (Doc. 22)("Response").  Guidelines § 5K2.1 provides:

---

warranted, the court <u>may</u> consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." U.S.S.G. § 1B1.4 (citing 18 U.S.C. § 3661)(emphasis added).  U.S.S.G. § 1B1.4, however, is not a basis for a departure.  U.S.S.G. § 1B1.4 recognizes that the Court is permitted to "consider, without limitation, any information concerning the background, character and conduct of the defendant, unless prohibited by law."  The Court does not purport to place a limitation upon the information that it can consider in sentencing Johnson; however, U.S.S.G. § 1B1.4 alone does not provide grounds for departure.  Rather, the United States must identify an applicable provision under which a departure is authorized and warranted.  In this opinion, the Court will consider whether a departure is authorized and warranted under the two provisions that the United States has specifically identified, U.S.S.G. § 5K2.1 and 5K2.21.

If death resulted, the court may increase the sentence above the authorized guideline range.

Loss of life does not automatically suggest a sentence at or near the statutory maximum.  The sentencing judge must give consideration to matters that would normally distinguish levels of homicide, such as the defendant's state of mind, and the degree of planning or preparation.  Other appropriate factors are whether multiple deaths resulted, and the means by which life was taken.  The extent of the increase should depend on the dangerousness of the defendant's conduct, the extent to which death or serious injury was intended or knowingly risked, and the extent to which the offense level for the offense of conviction, as determined by the other Chapter Two guidelines, already reflects the risk of personal injury.  For example, a substantial increase may be appropriate if the death was intended or knowingly risked or if the underlying offense was one for which the base offense levels do not reflect an allowance for the risk of personal injury, such as fraud.

U.S.S.G. § 5K2.1.  Johnson cites two Tenth Circuit cases for the proposition that § 5K2.1 contains a foreseeability requirement.  See Response at 3-4.  Johnson first cites to United States v. Metzger, 233 F.3d 1226, 1227 (10th Cir. 2000)(Lucero, J.), where the Tenth Circuit interpreted U.S.S.G. § 1B1.3(a)(3), which states, in pertinent part:

**Relevant Conduct (Factors that Determine the Guideline Range)**

(a)     Chapters Two (Offense Conduct) and Three (Adjustments).  Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

(1)     (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

- 8 -

(2)     solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3)     all harm that resulted from the acts or omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4)     any other information specified in the applicable guideline range.

U.S.S.G. § 1B1.3 (emphasis added).  The Tenth Circuit held that the "resulted from" language in U.S.S.G. § 1B1.3(a)(3) allows for increases in sentences for harms that were "reasonably foreseeable" and, on the facts before it, concluded that it was reasonably foreseeable in a police credit union robbery, that an off duty police officer would be in the credit union, would pursue the suspect, and would feel the need to use force, and that bystanders would be injured in the process.  See 233 F.3d at 1227-28.   While United States v. Metzger, 233 F.3d at 1226, is persuasive authority, it is not binding on this Court in determining whether § 5K2.1 contains a reasonably foreseeable requirement.  Here, the Court must interpret the meaning of § 5K2.1's "death resulted" language and not U.S.S.G. §1B1.3(a)(3)'s "resulted from" language.  Johnson also cites United States v. Evans, 744 F.3d 1192 (10th Cir. 2014)(Kelly, J.), but that case is equally inapplicable.  In United States v. Evans, 744 F.3d at 1192, the Tenth Circuit addressed whether "actual loss" for fraud under U.S.S.G. § 2B1.1 must be reasonably foreseeable and not whether § 5K2.1 contains a reasonable foreseeability requirement.  See 744 F.3d at 1196.

The Court concludes that § 5K2.1 contains a reasonably foreseeable requirement, however, because there is a Tenth Circuit case directly on point.   In United States v. Montgomery, 550 F.3d 1229 (10th Cir. 2008)(Holmes, J.), defendant Montgomery's wife used a firearm unlawfully possessed by Montgomery to kill herself.   See 550 F.3d at 1231. Montgomery pleaded guilty to one count of possession of firearms and ammunition by a

convicted felon in violation of 18 U.S.C. § 922(g)(1).   See 550 F.3d at 1230-31.   The government then moved for a 4-level upward departure under § 5K2.1, because "the death of Mr. Montogomery's wife resulted from his unlawful possession of firearms."   550 F.3d at 1231.   Montgomery filed an objection to the upward departure.   See 550 F.3d at 1231.   The district court sustained the objection in part, imposed a 2-level upward departure under § 5K2.1, and found that Montgomery contributed to his wife's suicide by "engag[ing] in a pattern of escalating violence toward [her]"; by threatening to take their son away from her; and by "attempting to thwart [her] efforts to receive treatment for her apparent depression."   550 F.3d at 1231-32.   The district court concluded that because of the facts and circumstances, an upward departure was justified and that the case fell "squarely outside of the 'heartland' of typical cases involving a felon in possession of a firearm."   550 F.3d at 1232.   The district court subsequently reconsidered its decision in light of the Supreme Court's decision in Blakely v. Washington, 542 U.S. 296 (2004), and vacated its upward departure.   See 550 F.3d at 1230-32.   The Tenth Circuit reversed the district court's decision to vacate the upward departure, holding that

> the district court had committed nonconstitutional error under United States v. Booker, 543 U.S. 220 (2005), by treating the Guidelines, at least in part, as mandatory and that the error was not harmless because "[t]he record clearly indicates the district court would have imposed a higher sentence if it believed it had the discretion to do so."

550 F.3d at 1232 (citing United States v. Montgomery, 439 F.3d 1260 (10th Cir. 2006)).   The Tenth Circuit remanded the case for resentencing, and the district court re-imposed its original sentence, including the 2-level upward departure, relying on the reasoning, legal authority, and factual basis set forth in the previous order.   See 550 F.3d at 1230-32.

Montgomery appealed to the Tenth Circuit, disputing whether the district court's reliance on his wife's suicide was a permissible departure factor under § 5K2.1.   See 550 F.3d at 1232-

33.   First, the Tenth Circuit rejected Montgomery's argument that § 5K2.1's plain language restricts district courts to granting an upward departure only when the "death resulted" from a homicide, or in the alternative, that § 5K2.1 cannot be extended to include a death that occurs as a result of suicide.   550 F.3d at 1233-34.   The Tenth Circuit next turned to Montgomery's argument that an upward departure was improper under § 5K2.1, because his wife's death did not result from his crime of conviction, felon in possession of a firearm.   See 550 F.3d at 1235. The Tenth Circuit observed that Montgomery's argument rested on two interrelated contentions:

> [F]irst, that there is an insufficient relationship between Mr. Montgomery's offense of being an unlawful felon in possession of a firearm and Ms. Cottam-Montgomery's suicide; and second, that the basis for the district court's upward departure was Mr. Montgomery's behavior toward his wife, which he asserts is unrelated to the crime of conviction.

550 F.3d at 1235.   Relying on United States v. Fortier, 242 F.3d 1224, 1232-33 (10th Cir. 2001)(Lucero, J.), superseded by statute on other grounds, PROTECT Act of 2003, Pub. L. No. 108-21, 117 Stat. 650, 670-71, the Tenth Circuit explained that the grounds on which a departure is based under § 5K2.1 must be reasonably foreseeable:

> The touchstone of the inquiry is whether it was reasonably foreseeable to Mr. Montgomery that his criminal conduct could result in his wife's death.   *United States v. Fortier*, 242 F.3d 1224, 1232-33 (10th Cir. 2001), *superseded by statute on other grounds*, PROTECT Act of 2003, Pub. L. No. 108-21, 117 Stat. 650, 670-71.   In *Fortier*, this Court affirmed the district court's upward departure under § 5K2.1 for deaths that were the product of the Oklahoma City bombing, which were a reasonably foreseeable consequence of, although not directly caused by, the defendant's conduct.   The defendant pleaded guilty to conspiring to transport and transporting stolen firearms, making a false statement to the F.B.I., and misprision of a felony.   *Id.* at 1226.   On appeal, he argued that there was an insufficient nexus between the Oklahoma City bombing and his admitted wrongdoing to permit an upward departure.
>
> We rejected that argument.   Initially, we observed that there was "colorable argument" that defendant's "conduct bordered on recklessness" (i.e., involved actual awareness of a risk and a decision to disregard it).   *Id.* at 1232.   But we concluded that irrespective of whether his conduct was reckless, defendant bore

"sufficient legal responsibility for the bombing to support an upward departure." *Id.* at 1232.

> Several of the Guidelines relied upon by the district court for the upward departure permit an increased sentence where the specified harm "resulted" from the defendant's conduct. *We have interpreted the words "resulted from" in the Guidelines as permitting an increased sentence for harms that were a "reasonably foreseeable" consequence of a defendant's conduct even where a defendant did not directly cause the specified harm.* Fortier well knew -- in great detail -- McVeigh's and Nichols's plans to bomb the Murrah Building.  Fortier also knew the guns he sold for McVeigh and Nichols were stolen as a "fund-raiser" to offset expenses related to the bombing. Although the government cannot directly trace any of the proceeds from Fortier's criminal activity, a reasonably foreseeable consequence of giving McVeigh and Nichols $2000 of the proceeds was to further the Oklahoma City bombing conspiracy.

*Fortier*, 242 F.3d at 1232-33 (emphasis added)(citations and internal quotation marks omitted).  Because the defendant "should have known his sale of firearms had the capacity to further the bombing of the Murrah Federal Building (an offense he knew would for certain result in many deaths)," this Court affirmed the upward departure.  *Id.* at 1232 (internal quotation marks omitted).

Here, as in *Fortier*, the district court's upward departure is supported by Mr. Montgomery's knowledge of the possible consequences of his unlawful actions.  Mr. Montgomery's unlawful possession of firearms was a "link[ ] in the chain of events leading up to" his wife's suicide.  *See id.* at 1233 n. 5.  As stated by the district court, "this is not simply a case of a felon in possession of a firearm whose wife committed suicide using his illegal weapon."  Aplt.App. at 22.  Rather, aggravating factors and circumstances made the ultimate consequence of Mr. Montgomery's behavior-his wife's death-reasonably foreseeable as resulting from his unlawful behavior.

550 F.3d at 1235-36.

The Tenth Circuit agreed with the District Court that "whether other individuals foresaw Ms. Cottam-Montgomery's act is not the pertinent issue.  Mr. Montgomery's 'conduct was such that he should have anticipated that a serious injury or death could result from his conduct."  550 F.3d at 1236.  The Tenth Circuit stated that, while Montgomery may not have known his wife's plans in great detail, like the defendant in United States v. Fortier, 242 F.3d at 1224, "by way of

his superior knowledge and unique perspective, [the defendant] <u>reasonably could have foreseen</u> that his unlawful actions could result in his wife's death." 550 F.3d at 1236 (emphasis added). The Tenth Circuit emphasized, however, that <u>United States v. Fortier</u>, 242 F.3d at 1224, does not stand for the proposition that a defendant must have actual knowledge; rather, under § 5K2.1, the test is one of reasonable foreseeability. <u>See</u> 550 F.3d at 1236 (citing to other Tenth Circuit case law including <u>United States v. Metzger</u>, 233 F.3d at 1226 and law in other circuits). In sum, in <u>United States v. Montgomery</u>, 550 F.3d 1230, the Tenth Circuit concluded that, under the specific circumstances of the case, where the defendant had a unique perspective and superior knowledge, an upward departure was permissible under § 5K2.1, and therefore affirmed the district court's sentence . <u>See</u> 550 F.3d 1236-37.

Applying <u>United States v. Montgomery</u>, 550 F.3d at 1229, and <u>United States v. Fortier</u>, 242 F.3d at 1224, to the facts of this case, the Court concludes that Descheenie's death was not reasonably foreseeable. In <u>United States v. Fortier</u>, 242 F.3d at 1224, Fortier "well knew -- in great detail -- McVeigh's and Nichol's plans to bomb the Murrah Building," <u>see</u> 242 F.3d at 1232-33 and that "the guns he sold for McVeigh and Nichols were stolen as a fund-raiser to offset expenses related to the bombing," <u>see</u> 242 F.3d at 1232-33. The Tenth Circuit observed that Fortier's conduct bordered on recklessness, or actual awareness of a risk and a decision to disregard it. 242 F.3d at 1232. The Tenth Circuit, in <u>United States v. Montgomery</u>, re-emphasized the importance of knowledge of details; the Tenth Circuit observed that Montgomery's possession of the illegal firearm alone would not have been sufficient to link him to his wife's suicide; rather, "by way of his superior knowledge and unique perspective, [the defendant] reasonably could have foreseen that his unlawful actions could result in his wife's death." 550 F.3d at 1236. <u>United States v. Montgomery</u> involved Montgomery's special

knowledge, see 550 F.3d at 1229, and United States v. Fortier, involved Fortier's almost actual awareness that McVeigh and Nichols would kill civilians in the Murrah Building, see 242 F.3d at 1224.  In contrast to United States v. Montgomery, 550 F.3d at 1229, and United States v. Fortier, 242 F.3d at 1224, this case involves an unlikely event that Johnson had no special knowledge about.  Moreover, the Court concludes that, because Johnson did not commit the crime of robbery with considerable force and violence,[6] or intimidation, but rather, stealthily removed Descheenie's wallet from his back pocket, it was not reasonably foreseeable that Descheenie would die as a result of the theft.

The Court could not find any similar cases in the civil tort context.  The felony-murder context, however, is instructive and a number of courts have addressed whether death resulting from robbery or burglary is reasonably foreseeable.  In People v. Stamp, 2 Cal. App. 3d 203 (Cal. Ct. App. 1969), someone robbed business offices whose 60-year-old manager had a history of heart disease.  See 2 Cal. App. 3d at 208.  The defendants, armed with a gun and a blackjack, entered the rear of the building of the offices of General Amusement Company, and ordered the employees to go to the front of the premises, where the two secretaries were working.  See 2 Cal. App. 3d at 208.  One of the defendants then went into the office of Carl Honeyman, the owner and manager.  Honeyman, "looking very frightened and pale, emerged from the office in a 'kind of hurry.'"  2 Cal. App. 3d at 208.  The robbery victims were required to lie down on the floor while the robbers took money and fled out the back door.  2 Cal. App. 3d at 208.  As the robbers were leaving, they told the victims to remain on the floor for five minutes so that no one would get hurt.  2 Cal. App. 3d at 208.

---

[6]The Court is not making any determination as to whether Johnson committed a crime of violence under federal law or the guidelines; it is simply saying that pick pocketing is different from bank robbery or putting a gun in a victim's face.

Honeyman, who had been lying next to the counter, had to use it to steady himself in getting up off the floor.  Still pale, he was short of breath, sucking air, and pounding and rubbing his chest.  As he walked down the hall, in an unsteady manner, still breathing hard and rubbing his chest, he said he was having trouble "keeping the pounding down inside" and that his heart was "pumping too fast for him."  A few minutes later, although still looking very upset, shaking, wiping his forehead and rubbing his chest, he was able to walk in a steady manner into an employee's office.  When the police arrived, almost immediately thereafter, he told them he was not feeling very well and that he had a pain in his chest. About two minutes later, which was 15 or 20 minutes after the robbery had occurred, he collapsed on the floor.  At 11:25 he was pronounced dead on arrival at the hospital.  The coroner's report listed the immediate cause of death as heart attack.

The employees noted that during the hours before the robbery Honeyman had appeared to be in normal health and good spirits.  The victim was an obese, 60-year-old man, with a history of heart disease, who was under a great deal of pressure due to the intensely competitive nature of his business.  Additionally, he did not take good care of his heart.

Three doctors, including the autopsy surgeon, Honeyman's physician, and a professor of cardiology from U.C.L.A., testified that although Honeyman had an advanced case of atherosclerosis, a progressive and ultimately fatal disease, there must have been some immediate upset to his system which precipitated the attack. It was their conclusion in response to a hypothetical question that but for the robbery there would have been no fatal seizure at that time.  The fright induced by the robbery was too much of a shock to Honeyman's system.  There was opposing expert testimony to the effect that it could not be said with reasonable medical certainty that fright could ever be fatal.

2 Cal. App. 3d at 208.

One of the defendants appealed his conviction for felony-murder, asserting that the evidence was insufficient to prove that the robbery factually caused Honeyman's death.  See 2 Cal. App. 3d at 209.  The Court of Appeal rejected this argument, holding that the jury could have reasonably deduced from the evidence that the robbery caused Honeyman's death.  See 2 Cal. App. 3d at 209.  The Court of Appeal explained that: "A review of the facts as outlined above shows that there was substantial evidence of the robbery itself, that appellants were the robbers, and that but for the robbery the victim would not have experienced the fright which brought on the fatal heart attack."  2 Cal. App. 3d at 209.  As in People v. Stamp, there is no

- 15 -

question in this case that Johnson's theft was the factual cause of Descheenie's death.   The question, however, is whether the death was reasonably foreseeable.   People v. Stamp is less instructive regarding reasonable foreseeability, however, for under the California felony-murder rule, "a felon is held strictly liable for all killings committed by him or his accomplices in the course of the felony," regardless whether the deaths are foreseeable.  2 Cal. App. 3d at 210.  As explained above, there is no strict liability under § 5K2.1; rather, § 5K2.1 contains a reasonable foreseeability requirement.

State v. Reardon, 486 A.2d 112 (Sup. Jud. Ct. of Maine 1984) sheds more light on the question of foreseeability in the robbery context.   In that case, the Supreme Judicial Court of Maine addressed whether a robbery victim's death is reasonably foreseeable for purposes of the felony murder rule where he suffers a heart attack after chasing his attackers.   See 486 A.2d at 112.  The Supreme Judicial Court of Maine concluded that there was sufficient evidence to find beyond a reasonable doubt that the victim's death was a reasonably foreseeable result of the robbery:

> In his extended and comprehensive findings of fact, the presiding justice as the trier of fact found among other things, that the defendant's conduct in using physical force in the manner that he did upon the person of Mr. Webb for the purpose of robbing him of his wallet did cause
>
>> such stress to Mr. Webb, that he suffered a heart attack which would not have occurred but for the defendant's conduct and that it was a reasonably foreseeable consequence that robbing Mr. Webb in this manner would cause a person of his age and appearance and of poor cardiovascular condition, which was also reasonably foreseeable, to suffer a heart attack and death.
>
> The Justice further concluded that
>
>> it was reasonably foreseeable that as a result of the commission of this robbery Mr. Webb would possibly give chase, would be in a position and would possibly retell the story, both of which events could cause the kind of additional stress testified to by the Chief

- 16 -

> Medical Examiner, Dr. Ryan, to be a cause of heart attack and death, [and that] . . . either, by itself [the robbery by use of physical force], or by the chasing after the individuals and attempting to get his property back or in the retelling of the story in reporting that fact to the police officers just a few minutes later, any one of those or any combination of those would cause the kind of stress which would precipitate the kind of heart attack that Mr. Webb sustained.

486 A.2d at 117-18.  The Supreme Judicial Court of Maine affirmed the trial court's findings, concluding that there was sufficient evidence from which the trier of fact could rationally have found "beyond a reasonable doubt proof of the charge of felony murder in terms of its essential elements, i.e. that the defendant's perpetration of a robbery upon the person of Mr. Webb in fact caused Mr. Webb's death and that such death was a reasonably foreseeable consequence of the robbery."  486 A.2d at 117-18.

> The presiding justice was warranted in finding beyond a reasonable doubt from all the evidence in the case, including the expert testimony, that "but for" the robbery and the immediate sequels to it of chasing his attackers and recounting the distressing episode to the police, Mr. Webb would not have died of heart failure, and that any concurrent cause attributable to his predisposition to heart problems on account of his severe arteriosclerotic condition was not alone sufficient to produce his death.

486 A.2d at 117-18.

The Court concludes that Descheenie's death was not a reasonably foreseeable consequence of the theft.  Here, Johnson did not use any violence, as a lay person would understand that term, and much force at all, or intimidation to take Descheenie's wallet; rather, he stealthily removed it from Descheenie's back pocket.  See PSR ¶ 8, at 4.  It was not reasonably foreseeable that taking Descheenie's wallet in this manner would cause a person, even of his age, and, of his appearance and physical condition, to suffer from cardiovascular problems and die.  A stealthy theft is not the same as a robbery involving threats of considerable force and violence, or intimidation.  This factor distinguishes Johnson's case from State v.

Reardon and the Court therefore concludes that Johnson's conduct was not such that he should have anticipated that his actions, in attempting to pickpocket Descheenie, could result in Descheenie's death.  The base offense for Johnson's offense of conviction does not reflect the risk of death, and there is no evidence that it was reasonably foreseeable that Descheenie could die.  The Court therefore concludes that, under these circumstances, an upward departure is not authorized under § 5K2.1.

> **B.**     **EVEN IF THIS IS A CASE IN WHICH A DEPARTURE IS AUTHORIZED UNDER U.S.S.G. § 5K2.1, THE COURT EXERCISES ITS DISCRETION TO NOT UPWARDLY DEPART.**

While the Court does not believe that the case law allows an upward departure under § 5K2.1, because the death was not reasonably foreseeable, even if the Tenth Circuit or Supreme Court thought otherwise, the Court would still deny the United States' request for an upward departure under § 5K2.1.  Even if the death were reasonably foreseeable, the Court finds it difficult to agree with the United States' request for an enhanced criminal penalty with what occurred in this case.  The Court is having trouble with squaring the general notion that the Court tries the Defendant only for the crimes before the Court, and the notion that it punishes for anything that is reasonably foreseeable.  Many people in the criminal justice system have low cognitive capacities and low IQs; they often have long criminal records.  They do not make good judgments, because they are not able to predict the consequences of their actions.  In any case, the Court chooses not to depart, because it does not believe that departure is warranted under the facts of the case.  Unfortunately, the nation's prisons contain many who have some diminished capacity and make poor judgments.  The Court is having trouble distinguishing Johnson's case of theft or robbery here, and the crimes that many other defendants commit which have collateral damages on family and society.  The Court thinks the case falls into the heartland of cases it sees,

although it admits that it had a sad ending.  Thus, even if the departure were authorized under the facts and circumstances of this case, the Court would exercise its discretion not to depart, because it remains convinced that Johnson's acts -- his crime -- remain in the heartland of cases that the federal courts see.   While the ending is odd and sad, Johnson did not do anything particularly aggravating that warrants an upward departure.

## II.    THE COURT WILL NOT GRANT AN UPWARD DEPARTURE UNDER U.S.S.G. § 5K2.21.

The Court concludes that it is not authorized to upwardly depart under U.S.S.G. § 5K2.21.  Thus the Court will not grant an upward departure.  Even if it were so authorized here, it would exercise its discretion to not upwardly depart.

### A.    THE COURT IS NOT AUTHORIZED TO UPWARDLY DEPART UNDER U.S.S.G. § 5K2.21.

In its Motion, the United States further contends that the Court should upwardly depart under U.S.S.G. § 5K2.21, because Johnson was originally charged with robbery in Indian country in violation of 18 U.S.C. §§ 2111 and 1153.  See Motion at 6-7.  According to the United States, "after two grand jury continuances, the United States and the Defendant reached a plea agreement to which the Defendant pleaded guilty to an information charging him with theft in Indian country in violation of 18 U.S.C. §§ 661 and 1153."  Motion at 7.  Based on this information, the United States concludes in its Motion: "Neither the robbery nor the theft contemplates the death of a person as part of the elements for each offense.  Nevertheless, the Defendant's conduct led to the death of J.D., which is a relevant fact that warrants an upward departure in the Defendant's sentence."  Motion at 7.  At Johnson's sentencing hearing, the United States conceded that "the main factor that the Court [should] take into consideration for an upward departure is the death of the victim and not whether the defendant was charged or not

charged with robbery." Tr. at 12:17-13:6 (Ruiz-Velez). Further, the United States agreed at the hearing that, while an upward departure is warranted in this case, it is not certain that the best place to rest it is on § 5K2.21. See Tr. at 13:7-12 (Court, Ruiz-Velez). The PSR does not even mention that Johnson was originally charged with robbery, but rather contends: "The circumstances of the instant offense are not considered in regards to the applicable guidelines section, which does not provide guidance in the event of a death in the manner it occurred in connection to the theft." PSR ¶ 78, at 15. Although the USPO and the United States appear to support an upward departure under § 5K2.21 because of Descheenie's death, the Court will also examine whether it is authorized to upwardly depart based on the original robbery charge.

Section 5K2.21 provides:

§ 5K2.21. Dismissed and Uncharged Conduct (Policy Statement)

The court may depart upward to reflect the actual seriousness of the offense based on conduct (1) underlying a charge dismissed as part of a plea agreement in the case, or underlying a potential charge not pursued in the case as part of a plea agreement or for any other reason; and (2) that did not enter into the determination of the applicable guideline range.

U.S.S.G. § 5K2.21. Section 5K2.21 was added to the Sentencing Guidelines in 2000 to address a circuit conflict "regarding whether a court could base an upward departure on conduct that was dismissed or not charged as part of a plea agreement in the case." United States v. Newsom, 508 F.3d 731, 734 (5th Cir. 2007). See United States v. Bolden, 368 F.3d 1032, 1035 (8th Cir. 2004)(explaining that the amendment resolved a conflict in the circuit courts of appeals as to whether § 5K2.0 permitted consideration of dismissed or uncharged conduct). The United States Court of Appeals for the Fifth Circuit has articulated: "In adopting § 5K2.21, the Sentencing Commission endorsed the position held by the majority of circuits: a departure based on conduct

uncharged or dismissed pursuant to a plea agreement was proper and did not undermine the expectations of the parties to the plea agreement."  United States v. Newsom, 508 F.3d at 734.

### 1.   The Court is Not Authorized to Upwardly Depart Merely because Johnson was Originally Charged with Robbery.

A court is authorized to depart upward under § 5K2.21 "to reflect the actual seriousness of the offense based on conduct (1) underlying a charge dismissed as part of a plea agreement in the case [. . . ]; and (2) that did not enter into the determination of the applicable guideline range."  U.S.S.G. § 5K2.21.  Here, the United States asserts that Johnson was originally charged with robbery in Indian country in violation of 18 U.S.C. §§ 2111 and 1153, and the United States and the Defendant ultimately reached a plea agreement in which Johnson pleaded guilty to an information charging him with theft in Indian country in violation of 18 U.S.C. §§ 661 and 1153. See Motion at 6-7.  In other words, there was a charge -- robbery in Indian country in violation of 18 U.S.C. §§ 2111 and 1153 -- that was dismissed as part of Johnson's plea agreement. Section 5K2.21 does not state that an upward departure is authorized where a charge was dismissed as part of a plea agreement; rather, it establishes that an upward departure is authorized based on conduct underlying a dismissed charge that did not enter into the determination of the applicable guideline range.  The United States, however, does not identify any conduct underling the original robbery charge that did not enter into the determination of the applicable guideline range.

The robbery statute under which Johnson was originally charged, 18 U.S.C. § 2111, states: "Whoever, within the special maritime and territorial jurisdiction of the United States, by force and violence, or by intimidation, takes or attempts to take from the person or presence of another anything of value, shall be imprisoned not more than fifteen years."  As Johnson points out, then, robbery requires "force and violence, or [. . . ] intimidation."  Response at 4.  See 18

U.S.C. § 2111.  The United State does not point to any evidence that Johnson used force and violence, or intimidation, in taking Descheenie's wallet.  The Court is also unable to find any such evidence in the record.  Moreover, the United States does not identify any conduct underlying the original robbery charge that was not taken into account under the applicable guidelines range for theft in Indian country in violation of 18 U.S.C. §§ 661 and 1153.  Instead, it appears that the United States pursued the theft charge rather than the robbery charge precisely because there was no force and violence, or intimidation in Johnson's case, or at least because it could not prove them eliminates exclusion.  The Court thus concludes that it is not authorized to upwardly depart under § 5K2.21 for the uncharged robbery, because there was no robbery and the Court cannot find such by a preponderance of the evidence.

### 2.    The Court is not Authorized to Upwardly Depart Merely because Descheenie Died.

Both the United States and the USPO contend that an upward departure is authorized under § 5K2.21, because Johnson's conduct led to the death of Descheenie.  See Motion at 7; PSR ¶ 78, at 15.  Section 5K2.21 states that a court may depart upward "to reflect the actual seriousness of the offense based on conduct (1) [. . .] underlying a potential charge not pursued in the case as part of a plea agreement or for any other reason; and (2) that did not enter into the determination of the applicable guideline range."  U.S.S.G. § 5K2.21.  The USPO and the United States are correct that the second prong of § 5K2.21 is met here, because the death of Descheenie "did not enter into the determination of the applicable guideline range."  U.S.S.G. § 5K2.21.  The question, however, is whether there was "conduct [. . .] underlying a potential charge not pursued in the case."  U.S.S.G. § 5K2.21.  While the Court agrees that Johnson engaged in conduct that factually led to Descheenie's death, the Court is not persuaded that Johnson's conduct formed the basis of a "potential charge not pursued in the case."  Neither the United

States nor the USPO have identified a "potential charge" that the United States could have pursued against Johnson for the death of Descheenie.  The Court has identified two possibly applicable statutes.  First, 18 U.S.C. § 1112 states in pertinent parts:

> **(a)** Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:
>
> Voluntary -- Upon a sudden quarrel or heat of passion.
>
> Involuntary -- In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.

18 U.S.C. § 1112.  Johnson could not have been charged with voluntary manslaughter, however, because he did not kill Descheenie in the heat of passion or upon a sudden quarrel.  See 18 U.S.C. § 1112.   Regarding involuntary manslaughter under § 1112, in this case, Johnson committed a felony and not an unlawful act not amounting to a felony.  Additionally, Johnson did not kill Descheenie without malice "in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death"; rather, Descheenie's death occurred during the commission of an unlawful act -- the theft.

Second, the United States might have relied upon 18 U.S.C. § 1111, which covers the crime of felony murder:

> **(a)** Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; <u>or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery;</u> or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

18 U.S.C. § 1111 (emphasis added).  18 U.S.C. § 1111 does not, however, enumerate the crime of theft as one of the felonies upon which a charge of felony murder can rest.  See <u>United States</u>

v. Nguyen, 155 F.3d 1219, 1225-26 (10th Cir. 1998)(stating that 18 U.S.C. § 1111 characterizes felony murder as first degree murder which is "[e]very murder . . . committed in the perpetration of, or attempt to perpetrate, any [of the listed felonies]").  The Court thus concludes that it is not authorized to upwardly depart under § 5K2.21, because of Descheenie's death.

   **B.   EVEN IF THIS IS A CASE IN WHICH A DEPARTURE IS AUTHORIZED UNDER U.S.S.G. § 5K2.21, THE COURT EXERCISES ITS DISCRETION TO NOT UPWARDLY DEPART.**

   While the Court does not believe that the case law allows an upward departure under § 5K2.21, even if the Tenth Circuit or Supreme Court thought otherwise, the Court would still deny the United States' request for an upward departure under § 5K2.21.  Even if the Court were authorized to depart because Johnson was originally charged with robbery, or because he could have potentially been charged with involuntary manslaughter or felony murder, the Court has trouble reconciling the United States' request for an enhanced criminal penalty with what occurred in this case.  The Court thinks the case falls into the heartland of cases it sees, although it admits that it had a sad ending.  Thus, even if the departure were authorized under the facts and circumstances of this case, the Court would exercise its discretion not to depart, because it remains convinced that Johnson's acts -- his crime -- remain in the heartland of cases that the federal courts see.   This suggests the Court should impose a sentence within the heartland of the guidelines range.   While the ending is odd and sad, Johnson did not do anything particularly aggravating.  It remains a pathetic case more than a scary crime.

**III.   CONSIDERING THE § 3553(a) FACTORS, THE COURT WILL SENTENCE JOHNSON AT THE HIGH END OF THE GUIDELINES RANGE.**

   The final step in the determination of a defendant's sentence is to apply the factors that 18 U.S.C. §3553(a) sets forth.  The United States asks the Court to vary upward in light of the §3553(a) factors.  In pertinent part, § 3553(a) directs courts to consider:

**(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;

**(2)** the need for the sentence imposed--

  **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

  **(B)** to afford adequate deterrence to criminal conduct;

  **(C)** to protect the public from further crimes of the defendant; and

  **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

**(3)** the kinds of sentences available;

**(4)** the kinds of sentence and the sentencing range established for  . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . issued by the Sentencing Commission . . .

**(5)** any pertinent policy statement . . . issued by the Sentencing Commission . . .

**(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

**(7)** the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).  After balancing the § 3553(a) factors, the Court concludes that it should

not vary outside of the advisory guidelines range of 6 to 12 months, but that a sentence at the

high end of the range is adequate to accomplish the goals of sentencing.

  [I]t  [is]  quite  clear  that  the  sentencing  court  is  not  required  to  consider individually each factor listed in § 3553(a) before issuing a sentence.  Moreover, [the Tenth Circuit] does not demand that the district court recite any magic words to show that it fulfilled its responsibility to be mindful of the factors that Congress has instructed it to consider.

United States v. Rines, 419 F.3d 1104, 1107 (10th Cir. 2005)(quoting United States v. Contreras-

Martinez, 409 F.3d 1236, 1242 (10th Cir. 2005).  The Court will briefly discuss, however, the

relevant § 3553(a) factors.

A. **THE NATURE AND CIRCUMSTANCES OF THE OFFENSE COUNSEL FOR A SENTENCE AT THE HIGH END OF THE GUIDELINES RANGE.**

The first § 3553(a) factor requires a sentencing court to consider "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). This offense involved Johnson's theft of Descheenie's wallet as well as $16.00 located inside the wallet, for which he is charged. Descheenie pursued Johnson in his vehicle and recovered both the wallet and the money from Johnson. After the items were returned, Descheenie began displaying symptoms of heart trouble, and he was taken to the hospital, where he died the following day. The month before the offense for which he is being sentenced, Descheenie had been diagnosed with congenital heart failure. If Descheenie had not died, the nature and circumstances of the offense would not be serious. He died, however, so the offense became more serious. While the Court generally sentences at the low end of the guidelines range unless there is a particularly aggravating factor, a death is a particularly aggravating factor. The circumstances of the offense thus suggest a sentence at the high end of the guidelines range.

B. **JOHNSON'S HISTORY AND CHARACTERISTICS COUNSEL FOR A SENTENCE AT THE HIGH END OF THE GUIDELINES RANGE.**

The first § 3553(a) factor also requires the sentencing court to consider "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Johnson had a difficult upbringing, which the United States does not dispute. He has, however, alcohol and substance abuse problems. Further, Johnson has a conviction for an aggravated battery, a violent crime, for which he was on parole at the time the underlying offense took place. See PSR ¶¶ 30, 6 and 79, 16. More concerning, Johnson was involved in a fight with another inmate during pretrial detention. See PSR ¶ 34, 8. The Court agrees with the United States that Johnson's conduct,

before and while in custody, shows violent tendencies and a lack of respect for the law.  See

Motion at 8.  This factor also puts upward pressure on the sentence.

>   C.   **THE NEED FOR THE SENTENCE IMPOSED TO PROMOTE RESPECT FOR THE LAW, PROVIDE JUST PUNISHMENT, ADEQUATE DETERRENCE, PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT AND THE KINDS OF SENTENCES AVAILABLE; AND THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES AMONG DEFENDANTS WITH SIMILAR RECORDS WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDUCT, ALL PUT UPWARD PRESSURE ON THE SENTENCE.**

An offense level of 8 and criminal history category III result in an imprisonment

guideline range of 6 to 12 months.  If the Court were to sentence Johnson at the low end of this

range, however, the sentence would not promote respect for the law.  When people die from a

crime -- even if the defendant did not intend a death -- the natural reaction is to expect a greater

sentence than one in which no death occurred; a sentence at the low end -- which is what a crime

without a death would get -- would not promote respect for the law.  The Court fears a 6-month

sentence would not promote respect for the law.  Further, a sentence at the higher end is needed

to provide just punishment, to afford adequate deterrence on the specific and general levels, and

to protect the public.  Thus, the Court sentences Johnson at the high end of the guidelines, to a

sentence of 12 months imprisonment, primarily to reflect the seriousness of Johnson's actions,

which resulted in a death.  Moreover, a sentence of 12 months-imprisonment avoids unwarranted

sentencing disparity among defendants with similar records who have been found guilty of

similar conduct, because it remains a guidelines sentence.  The Court concludes that a sentence

of 12 months is reasonable and will most effectively promote the sentencing goals of 18 U.S.C. §

3553(a).  The sentence is sufficient, without being greater than necessary, to comply with the

purposes set forth in the Sentencing Reform Act.

      **IT IS ORDERED** that the United States' request for an upward departure or a variance

is denied.  The Court sentences Defendant Orlando Jay Johnson to 12 months imprisonment.


                                     _____
                                      UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
  United States Attorney
Raquel Ruiz-Velez
  Assistant United State Attorney
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Margaret A. Katze
  Assistant Federal Public Defender
Albuquerque, New Mexico

      *Attorney for the Defendant*